Dissent by Judge Nguyen
ORDER
*1115 The opinion and dissent filed March 21, 2018, and reported at 885 F.3d 1150, are hereby amended. The amended opinion and dissent will be filed concurrently with this order.
Judges M. Smith and Murguia voted to deny the petition for rehearing en banc. Judge Nguyen voted to grant it. The full court has been advised of the petition for rehearing en banc, and no judge requested a vote on whether to rehear the matter en banc. Fed. R. App. P. 35.
The petition for rehearing en banc, filed April 11, 2018, is DENIED.
No further petitions for panel rehearing or rehearing en banc will be entertained in this case.
M. SMITH, Circuit Judge:
After a seven-day trial and two days of deliberation, a jury found that Pharrell Williams, Robin Thicke, and Clifford Harris, Jr.'s song "Blurred Lines," the world's best-selling single in 2013, infringed Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III's copyright in Marvin Gaye's 1977 hit song "Got To Give It Up." Three consolidated appeals followed.
Appellants and Cross-Appellees Williams, Thicke, Harris, and More Water from Nazareth Publishing, Inc. (collectively, Thicke Parties) appeal from the district court's judgment. They urge us to reverse the district court's denial of their motion for summary judgment and direct the district court to enter judgment in their favor. In the alternative, they ask us to vacate the judgment and remand the case for a new trial, on grounds of instructional error, improper admission of expert testimony, and lack of evidence supporting the verdict. If a new trial is not ordered, they request that we reverse or vacate the jury's awards of actual damages and infringer's profits, and the district court's imposition of a running royalty. Finally, they seek reversal of the judgment against Harris, challenging the district court's decision to overturn the jury's general verdict finding in Harris's favor.
Appellants and Cross-Appellees Interscope Records, UMG Recordings, Inc., Universal Music Distribution, and Star Trak, LLC (collectively, Interscope Parties) appeal from the district court's judgment. They urge us to reverse the judgment against them, challenging the district *1116 court's decision to overturn the jury's general verdict finding in their favor.
Appellees and Cross-Appellants Frankie Christian Gaye, Nona Marvisa Gaye, and Marvin Gaye III (collectively, Gayes) appeal from the district court's order on attorney's fees and costs. They request that we vacate and remand for reconsideration the district court's denial of attorney's fees, and award them their costs in full. The Gayes also protectively cross-appeal the district court's ruling limiting the scope of the Gayes' compositional copyright to the four corners of the sheet music deposited with the United States Copyright Office. In the event a new trial is ordered, the Gayes urge us to hold that Marvin Gaye's studio recording of "Got To Give It Up," rather than the deposit copy, establishes the scope of the Gayes' copyright under the Copyright Act of 1909.
We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Our law requires that we review this case, which proceeded to a full trial on the merits in the district court, under deferential standards of review. We accordingly decide this case on narrow grounds, and affirm in part and reverse in part.
FACTUAL AND PROCEDURAL BACKGROUND
A. "Got To Give It Up"
In 1976, Marvin Gaye recorded the song "Got To Give It Up" in his studio. "Got To Give It Up" reached number one on Billboard's Hot 100 chart in 1977, and remains popular today.
In 1977, Jobete Music Company, Inc. registered "Got To Give It Up" with the United States Copyright Office and deposited six pages of handwritten sheet music attributing the song's words and music to Marvin Gaye. Marvin Gaye did not write or fluently read sheet music, and did not prepare the deposit copy. Instead, an unidentified transcriber notated the sheet music after Marvin Gaye recorded "Got To Give It Up."
The Gayes inherited the copyrights in Marvin Gaye's musical compositions.
B. "Blurred Lines"
In June 2012, Pharrell Williams and Robin Thicke wrote and recorded "Blurred Lines." Clifford Harris, Jr., known popularly as T.I., separately wrote and recorded a rap verse for "Blurred Lines" that was added to the track seven months later. "Blurred Lines" was the best-selling single in the world in 2013.
Thicke, Williams, and Harris co-own the musical composition copyright in "Blurred Lines." Star Trak and Interscope Records co-own the sound recording of "Blurred Lines." Universal Music Distribution manufactured and distributed "Blurred Lines."
C. The Action
The Gayes made an infringement demand on Williams and Thicke after hearing "Blurred Lines." Negotiations failed, prompting Williams, Thicke, and Harris to file suit for a declaratory judgment of non-infringement on August 15, 2013.
The Gayes counterclaimed against the Thicke Parties, alleging that "Blurred Lines" infringed their copyright in "Got To Give It Up,"[1] and added the Interscope Parties as third-party defendants.
*1117 D. The District Court's Denial of Summary Judgment
The district court denied Williams and Thicke's motion for summary judgment on October 30, 2014.
1. The District Court's Interpretation of the Copyright Act of 1909
The district court ruled that the Gayes' compositional copyright, which is governed by the Copyright Act of 1909, did not extend to the commercial sound recording of "Got To Give It Up," and protected only the sheet music deposited with the Copyright Office. The district court accordingly limited its review of the evidence to the deposit copy, and concluded there were genuine issues of material fact.
2. The Evidence
The Thicke Parties relied upon the opinion of musicologist Sandy Wilbur. The Gayes relied upon the opinions of Dr. Ingrid Monson, the Quincy Jones Professor of African American Music at Harvard University, and musicologist Judith Finell. The experts disagreed sharply in their opinions, which they articulated in lengthy reports.
Finell opined that there is a "constellation" of eight similarities between "Got To Give It Up" and "Blurred Lines," consisting of the signature phrase, hooks,[2] hooks with backup vocals, "Theme X,"[3] backup hooks, bass melodies, keyboard parts, and unusual percussion choices.
Wilbur opined that there are no substantial similarities between the melodies, rhythms, harmonies, structures, and lyrics of "Blurred Lines" and "Got To Give It Up," and disputed each area of similarity Finell identified. The district court compared Finell's testimony with Wilbur's and, pursuant to the extrinsic test under copyright law, meticulously filtered out elements Wilbur opined were not in the deposit copy, such as the backup vocals, "Theme X," descending bass line, keyboard rhythms, and percussion parts.
The district court also filtered out several unprotectable similarities Dr. Monson identified, including the use of a cowbell, hand percussion, drum set parts, background vocals, and keyboard parts. After filtering out those elements, the district court considered Dr. Monson's analysis of harmonic and melodic similarities between the songs, and noted differences between Wilbur's and Dr. Monson's opinions.
After performing its analytical dissection, as part of the extrinsic test, the district court summarized the remaining areas of dispute in the case. The district court identified disputes regarding the similarity of the songs' signature phrases, hooks, bass lines, keyboard chords, harmonic structures, and vocal melodies. Concluding that genuine issues of material fact existed, the district court denied Williams and Thicke's motion for summary judgment.
E. Trial
The case proceeded to a seven-day trial. The district court ruled before trial that the Gayes could present sound recordings of "Got To Give It Up" edited to capture only elements reflected in the deposit copy. Consequently, the commercial sound recording of "Got To Give It Up" was not played at trial.
Williams and Thicke testified, each acknowledging inspiration from Marvin Gaye and access to "Got To Give It Up."
Finell testified that "Blurred Lines" and "Got To Give It Up" share many similarities, *1118 including the bass lines, keyboard parts, signature phrases, hooks, "Theme X," bass melodies, word painting, and the placement of the rap and "parlando" sections in the two songs. She opined that nearly every bar of "Blurred Lines" contains an element similar to "Got To Give It Up." Although the district court had filtered out "Theme X," the descending bass line, and the keyboard rhythms as unprotectable at summary judgment, Finell testified that those elements were in the deposit copy.
Dr. Monson played three audio-engineered "mash-ups" she created to show the melodic and harmonic compatibility between "Blurred Lines" and "Got To Give It Up." She testified that the two songs shared structural similarities on a sectional and phrasing level.
Wilbur opined that the two songs are not substantially similar and disputed Finell and Dr. Monson's opinions. Wilbur prepared and played a sound recording containing her rendition of the deposit copy of "Got To Give It Up."
Neither the Thicke Parties nor the Gayes made a motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) before the case was submitted to the jury.
On March 10, 2015, after two days of deliberation, the jury returned mixed general verdicts.[4] The jury found that Williams, More Water from Nazareth Publishing,[5] and Thicke infringed the Gayes' copyright in "Got To Give It Up." In contrast, the jury found that Harris and the Interscope Parties were not liable for infringement. The jury awarded the Gayes $4 million in actual damages, $1,610,455.31 in infringer's profits from Williams and More Water from Nazareth Publishing, and $1,768,191.88 in infringer's profits from Thicke.
F. The District Court's Order on Post-Trial Motions
The district court ruled on the parties' various post-trial motions in an omnibus order.
The Thicke Parties filed a motion for judgment as a matter of law, a new trial, or remittitur. The district court denied the Thicke Parties' motion for judgment as a matter of law and motion for a new trial, but remitted the award of actual damages and the award of Williams' profits.
The Gayes filed three motions, seeking (1) a declaration that Harris and the Interscope Parties were liable for infringement; (2) injunctive relief or, in the alternative, ongoing royalties; and (3) prejudgment interest. The district court construed the Gayes' motion for declaratory relief as a post-trial motion for judgment as a matter of law, and granted the motion, overturning the jury's general verdicts in favor of Harris and the Interscope Parties. The district court denied the Gayes' request for injunctive relief, but awarded them a running royalty of 50% of future songwriter and publishing revenues from "Blurred Lines." The district court granted in part the Gayes' motion for prejudgment interest.
G. The Judgment and Order on Attorney's Fees and Costs
The district court entered judgment on December 2, 2015. The court awarded the Gayes $3,188,527.50 in actual damages, profits of $1,768,191.88 against Thicke and $357,630.96 against Williams and More *1119 Water from Nazareth Publishing, and a running royalty of 50% of future songwriter and publishing revenues received by Williams, Thicke, and Harris.
On April 12, 2016, the district court denied the Gayes' motion for attorney's fees and apportioned costs between the parties. The parties timely appealed.
ANALYSIS
I. Governing Law
We begin by discussing the law applicable to this case.
A. Elements of a Copyright Infringement Claim
To prevail on a copyright infringement claim, a plaintiff must show that (1) he or she owns the copyright in the infringed work, and (2) the defendant copied protected elements of the copyrighted work. Swirsky v. Carey , 376 F.3d 841, 844 (9th Cir. 2004). A copyright plaintiff may prove copying with circumstantial, rather than direct, evidence. Three Boys Music Corp. v. Bolton , 212 F.3d 477, 481 (9th Cir. 2000). "Absent direct evidence of copying, proof of infringement involves fact-based showings that the defendant had 'access' to the plaintiff's work and that the two works are 'substantially similar.' " Id. (quoting Smith v. Jackson , 84 F.3d 1213, 1218 (9th Cir. 1996) ).
We use a two-part test for substantial similarity: an extrinsic test and an intrinsic test. Swirsky , 376 F.3d at 845. For a jury to find substantial similarity, there must be evidence on both the extrinsic and intrinsic tests. Id. (citing Rice v. Fox Broad. Co. , 330 F.3d 1170, 1174 (9th Cir. 2003) ). A district court applies only the extrinsic test on a motion for summary judgment, as the intrinsic test is reserved exclusively for the trier of fact. Benay v. Warner Bros. Entm't, Inc. , 607 F.3d 620, 624 (9th Cir. 2010).
The extrinsic test is objective. Swirsky , 376 F.3d at 845. It "considers whether two works share a similarity of ideas and expression as measured by external, objective criteria." Id. Application of "[t]he extrinsic test requires 'analytical dissection of a work and expert testimony.' " Id. (quoting Three Boys Music , 212 F.3d at 485 ). An analytical dissection, in turn, "requires breaking the works 'down into their constituent elements, and comparing those elements for proof of copying as measured by "substantial similarity." ' " Id. (quoting Rice v. Fox Broad. Co. , 148 F.Supp.2d 1029, 1051 (C.D. Cal. 2001) ).
The intrinsic test, on the other hand, is subjective. Three Boys Music , 212 F.3d at 485. It "asks 'whether the ordinary, reasonable person would find the total concept and feel of the works to be substantially similar.' " Id. (quoting Pasillas v. McDonald's Corp. , 927 F.2d 440, 442 (9th Cir. 1991) ).
"Because the requirement is one of substantial similarity to protected elements of the copyrighted work, it is essential to distinguish between the protected and unprotected material in a plaintiff's work."[6] Swirsky , 376 F.3d at 845. Still, "substantial similarity can be found in *1120 a combination of elements, even if those elements are individually unprotected." Id. at 848 ; see also Metcalf v. Bochco , 294 F.3d 1069, 1074 (9th Cir. 2002) ("Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection."); Three Boys Music , 212 F.3d at 485-86 (upholding jury's finding of substantial similarity based on "a combination of unprotectible elements"). This principle finds particular relevance in application of the intrinsic test, as a trier of fact may "find that the over-all impact and effect indicate substantial appropriation," even if "any one similarity taken by itself seems trivial." Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp. , 562 F.2d 1157, 1169 (9th Cir. 1977) (quoting Malkin v. Dubinsky , 146 F.Supp. 111, 114 (S.D.N.Y. 1956) ), superseded in part on other grounds , 17 U.S.C. § 504(b) ; see also Three Boys Music , 212 F.3d at 485.
B. The Standard of Similarity for Musical Compositions
We have distinguished between "broad" and "thin" copyright protection based on the "range of expression" involved. Mattel, Inc. v. MGA Entm't, Inc. , 616 F.3d 904, 913-14 (9th Cir. 2010). "If there's a wide range of expression ..., then copyright protection is 'broad' and a work will infringe if it's 'substantially similar' to the copyrighted work." Id. (citation omitted). On the other hand, "[i]f there's only a narrow range of expression ..., then copyright protection is 'thin' and a work must be 'virtually identical' to infringe." Id. at 914 (citation omitted). To illustrate, there are a myriad of ways to make an "aliens-attack movie," but "there are only so many ways to paint a red bouncy ball on blank canvas." Id. at 913-14. Whereas the former deserves broad copyright protection, the latter merits only thin copyright protection. See id.
We reject the Thicke Parties' argument that the Gayes' copyright enjoys only thin protection. Musical compositions are not confined to a narrow range of expression.[7] See Swirsky , 376 F.3d at 849 (noting that "[m]usic ... is not capable of ready classification into only five or six constituent elements," but "is comprised of a large array of elements"). They are unlike a page-shaped computer desktop icon, see Apple Computer, Inc. v. Microsoft Corp. , 35 F.3d 1435, 1444 (9th Cir. 1994), or a "glass-in-glass jellyfish sculpture," Satava v. Lowry , 323 F.3d 805, 810 (9th Cir. 2003). Rather, as we have observed previously, "[m]usic ... is not capable of ready classification into only five or six constituent elements," but is instead "comprised of a large array of elements, some combination of which is protectable by copyright." Swirsky , 376 F.3d at 849. As "[t]here is no one magical combination of ... factors that will automatically substantiate a musical infringement suit," and as "each allegation of infringement will be unique," the extrinsic test is met, "[s]o long as the plaintiff can demonstrate, through expert testimony ..., that the similarity was 'substantial' and to 'protected elements' of the copyrighted work." Id. We have applied the substantial similarity standard to musical infringement suits before, see id. ; Three Boys Music , 212 F.3d at 485, and see no reason to deviate from that standard now. Therefore, the Gayes' copyright is not limited to only thin copyright protection, and the Gayes need not prove virtual identity to substantiate their infringement action.
*1121 C. The Copyright Act of 1909
Marvin Gaye composed "Got To Give It Up" before January 1, 1978, the effective date of the Copyright Act of 1976. Accordingly, the Copyright Act of 1909 governs the Gayes' compositional copyright. See Twentieth Century Fox Film Corp. v. Entm't Distrib. , 429 F.3d 869, 876 (9th Cir. 2005) ; Dolman v. Agee , 157 F.3d 708, 712 n.1 (9th Cir. 1998).
While the Copyright Act of 1976 protects "works of authorship" fixed in "sound recordings," 17 U.S.C. § 102, the 1909 Act did not protect sound recordings. It is well settled that "[s]ound recordings and musical compositions are separate works with their own distinct copyrights."[8] See VMG Salsoul, LLC v. Ciccone , 824 F.3d 871, 877 (9th Cir. 2016) (quoting Erickson v. Blake , 839 F.Supp.2d 1132, 1135 n.3 (D. Or. 2012) ). It remains unsettled, however, whether copyright protection for musical compositions under the 1909 Act extends only to the four corners of the sheet music deposited with the United States Copyright Office, or whether the commercial sound recordings of the compositions are admissible to shed light on the scope of the underlying copyright. Here, the district court ruled that the 1909 Act protected only the deposit copy of "Got To Give It Up," and excluded the sound recording from consideration.
The Gayes cross-appeal the district court's interpretation of the 1909 Act only in the event the case is remanded for a new trial. The parties have staked out mutually exclusive positions. The Gayes assert that Marvin Gaye's studio recording may establish the scope of a compositional copyright, despite the 1909 Act's lack of protection for sound recordings. The Thicke Parties, on the other hand, elevate the deposit copy as the quintessential measure of the scope of copyright protection.[9] Nevertheless, because we do not remand the case for a new trial, we need not, and decline to, resolve this issue in this opinion. For purposes of this appeal, we accept, without deciding, the merits of the district court's ruling that the scope of the Gayes' copyright in "Got To Give It Up" is limited to the deposit copy.
II. The District Court's Order Denying Summary Judgment is Not Reviewable After a Full Trial on the Merits.
The Thicke Parties seek review of the district court's order denying their motion *1122 for summary judgment, contending that the district court erred in its application of the extrinsic test for substantial similarity.
The order is not reviewable. The Supreme Court has squarely answered the question: "May a party ... appeal an order denying summary judgment after a full trial on the merits? Our answer is no." Ortiz v. Jordan , 562 U.S. 180, 183-84, 131 S.Ct. 884, 178 L.Ed.2d 703 (2011). An order denying summary judgment is "simply a step along the route to final judgment." Id. at 184, 131 S.Ct. 884. "Once the case proceeds to trial, the full record developed in court supersedes the record existing at the time of the summary-judgment motion." Id.
The Thicke Parties argue that we may nonetheless review the district court's denial of summary judgment for legal error. We "generally do 'not review a denial of a summary judgment motion after a full trial on the merits.' " Escriba v. Foster Poultry Farms, Inc. , 743 F.3d 1236, 1243 (9th Cir. 2014) (quoting Banuelos v. Constr. Laborers' Tr. Funds for S. Cal. , 382 F.3d 897, 902 (9th Cir. 2004) ). We carved out an exception to this general rule in the past, concluding that we may review "denials of summary judgment motions where the district court made an error of law that, if not made, would have required the district court to grant the motion." Id. (quoting Banuelos , 382 F.3d at 902 ).
Ortiz calls into question the continuing viability of our exception.[10] In Ortiz , the Supreme Court declined to address the argument that " 'purely legal' issues capable of resolution 'with reference only to undisputed facts' " are preserved for appellate review even after trial. 562 U.S. at 189, 131 S.Ct. 884. Read broadly, Ortiz does not foreclose review of denials of summary judgment after trial, so long as the issues presented are purely legal. But read narrowly, the Court's dicta does not endorse such an exception either.
We need not decide today whether our exception survives Ortiz unaltered. The Thicke Parties' arguments "hardly present 'purely legal' issues capable of resolution 'with reference only to undisputed facts.' " Id. The district court's application of the extrinsic test of similarity was a factbound inquiry far afield from decisions resolving "disputes about the substance and clarity of pre-existing law." Id. The district court's ruling bears little resemblance to legal issues we have reviewed pursuant to our exception. See, e.g. , Escriba , 743 F.3d at 1243-45 (examining whether "the district court erred as a matter of law by entertaining [defendant's] 'legally impossible' theory of the case that [plaintiff] affirmatively declined to take FMLA leave"); Banuelos , 382 F.3d at 903 (examining whether "the district court erred as a matter of law when it concluded it could hear evidence outside the administrative record" in an ERISA case); Pavon v. Swift Transp. Co. , 192 F.3d 902, 906 (9th Cir. 1999) (reviewing the district court's ruling on claim preclusion). We accordingly conclude that Ortiz forecloses our review of the district court's denial of summary judgment.
III. The District Court Did Not Abuse its Discretion in Denying a New Trial.
We review the district court's denial of a motion for a new trial for abuse of discretion. Lam v. City of San Jose , 869 F.3d 1077, 1084 (9th Cir. 2017) (citing *1123 Molski v. M.J. Cable, Inc. , 481 F.3d 724, 728 (9th Cir. 2007) ). We may reverse the denial of a new trial only if the district court "reaches a result that is illogical, implausible, or without support in the inferences that may be drawn from the record." Id. (quoting Kode v. Carlson , 596 F.3d 608, 612 (9th Cir. 2010) ). "The abuse of discretion standard requires us to uphold a district court's determination that falls within a broad range of permissible conclusions, provided the district court did not apply the law erroneously." Id. (quoting Kode , 596 F.3d at 612 ).
The Thicke Parties argue that a new trial is warranted on three grounds: (1) Jury Instructions 42 and 43 were erroneous; (2) the district court abused its discretion in admitting portions of Finell and Dr. Monson's testimony; and (3) the verdict is against the clear weight of the evidence. We disagree, and discuss each ground in turn.
A. Instructions 42 and 43 Were Not Erroneous.
We review de novo whether jury instructions state the law accurately, but review a district court's formulation of jury instructions for abuse of discretion. Id. at 1085 (citing Hunter v. County of Sacramento , 652 F.3d 1225, 1232 (9th Cir. 2011) ). "In evaluating jury instructions, prejudicial error results when, looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered." Dang v. Cross , 422 F.3d 800, 805 (9th Cir. 2005) (alteration in original) (quoting Swinton v. Potomac Corp. , 270 F.3d 794, 802 (9th Cir. 2001) ).
1. Jury Instruction 42
The Thicke Parties argue that Instruction 42 allowed the jury to place undue weight on Williams and Thicke's statements claiming inspiration from "Got To Give It Up" and Marvin Gaye. The district court instructed the jurors:
In order to find that the Thicke Parties copied either or both of the Gaye Parties' songs, it is not necessary that you find that the Thicke Parties consciously or deliberately copied either or both of these songs. It is sufficient if you find that the Thicke Parties subconsciously copied either or both of the Gaye Parties' songs.
Because direct evidence is rare, copying is usually circumstantially proved by a combination of access and substantial similarity. See Swirsky , 376 F.3d at 844. As the Thicke Parties acknowledge, access may be "based on a theory of widespread dissemination and subconscious copying." Three Boys Music , 212 F.3d at 483. In short, there is no scienter requirement. See id. at 482-85. Instruction 42 stated as much.
The Thicke Parties argue that Instruction 42 was nonetheless inappropriate, because the issue of access was not at issue. Not so. The Thicke Parties take an unduly narrow view of Instruction 42 in isolation. The instructions as a whole make plain that a circumstantial case of copying requires not just access, but also substantial similarity. Instructions 28 and 41 provide that copying may be proven by demonstrating access plus substantial similarity.[11] Instruction 43 further underscores *1124 that the Gayes "must show that there is both substantial 'extrinsic similarity' and substantial 'intrinsic similarity' as to that pair of works." Looking to the jury instructions as a whole, see Dang , 422 F.3d at 805, it is clear that the district court properly instructed the jury to find both access and substantial similarity.
In light of the foregoing, we conclude that the district court did not err in giving Jury Instruction 42.
2. Jury Instruction 43
The Thicke Parties argue that Instruction 43 erroneously instructed the jury to consider unprotectable elements. Specifically, they contend that the district court instructed the jury that it "must consider" elements that they contend are not present in the deposit copy: "Theme X," the descending bass line, and keyboard parts. Instruction 43 states, in pertinent part:
Extrinsic similarity is shown when two works have a similarity of ideas and expression as measured by external, objective criteria. To make this determination, you must consider the elements of each of the works and decide if they are substantially similar. This is not the same as "identical." There has been testimony and evidence presented by both sides on this issue, including by expert witnesses, as to such matters as: (a) for "Got to Give It Up" and "Blurred Lines," the so-called "Signature Phrase," hook, "Theme X," bass melodies, keyboard parts, word painting, lyrics, [and] rap v. parlando .... The Gaye Parties do not have to show that each of these individual elements is substantially similar, but rather that there is enough similarity between a work of the Gaye Parties and an allegedly infringing work of the Thicke Parties to comprise a substantial amount.
First, the Thicke Parties take the word "must" out of context. Instruction 43's use of the word "must" serves to underline the extrinsic test's requirement that the jury compare the objective elements of the works for substantial similarity.
Second, Finell testified that "Theme X," the descending bass line, and the keyboard parts are reflected in the deposit copy, while Wilbur testified to the contrary. The experts' quarrel over what was in the deposit copy was a factual dispute for the jury to decide. Even if Instruction 43's inclusion of contested elements could have led the jury to believe that the elements were in the deposit copy, and to consider them as protectable elements for purposes of the substantial similarity analysis, we cannot view Instruction 43 in isolation. In light of the jury instructions as a whole, we do not conclude that the district court's listing of elements in Instruction 43 prevented the jury from making a factual determination of what was in the deposit copy.
The instructions on whole make clear that the jury could consider only elements in the deposit copy. Instruction 28 states that the Gayes bear "the burden of proving that the Thicke Parties copied original elements from the Gaye[s'] copyrighted work." Instruction 35, in turn, defines the Gayes' copyrighted work. Instruction 35 informed jurors that at the time the copyright in "Got To Give It Up" was registered, "only written music could be filed by a copyright owner with the Copyright Office as the deposit copy of the copyrighted work." In contrast, "[r]ecordings of musical compositions could not be filed with the Copyright Office at that time." The district court cautioned the jurors to distinguish *1125 between the commercial sound recording of "Got To Give It Up" and the deposit copy, noting that "although [a] sound recording[ ] of 'Got to Give It Up' ... w[as] made and released commercially, th[e] particular recording[ ] [is] not at issue in this case, w[as] not produced into evidence, and w[as] not played for you during the trial." What was at issue was "testimony from one or more witnesses from each side about what each thinks is shown on the deposit copy for each composition," as well as "recorded versions of each work that each side has prepared based on what each side contends is shown in the deposit copy that was filed with the Copyright Office." In short, the district court instructed the jurors that the deposit copy, not the commercial sound recording, was the copyrighted work in the case.
Harper House, Inc. v. Thomas Nelson, Inc. , 889 F.2d 197 (9th Cir. 1989), is not helpful to the Thicke Parties. In Harper House , we held that the district court erred in failing to give jury instructions that "adequately distinguish[ed] between protectable and unprotectable material." 889 F.2d at 207-08. The copyrighted works at issue in Harper House were organizers, which receive "extremely limited protection" and are "compilations consisting largely of uncopyrightable elements," such as "blank forms, common property, or utilitarian aspects." Id. at 205, 207-08.
Suffice to say, musical compositions are not like organizers, and this case is easily distinguishable. The jury never heard the commercial sound recording. Elements indisputably present only in the sound recording, such as the use of cowbell and party noises, were never played at trial. Had that been the case, the district court would have had to instruct the jury to distinguish between elements in the commercial recording and elements in the deposit copy. Instead, the jury heard sound clips edited to capture elements that the experts testified were in the deposit copy. The question of which expert to believe was properly confided to the jury.
The district court did not err in giving Instruction 43.
B. The District Court Did Not Abuse its Discretion in Admitting Portions of Finell and Dr. Monson's Testimony.
We review the district court's evidentiary rulings for abuse of discretion. Wagner v. County of Maricopa , 747 F.3d 1048, 1052 (9th Cir. 2013). The Thicke Parties contend that the district court abused its discretion in admitting portions of Finell and Dr. Monson's expert testimony, arguing that they based their testimony on unprotectable elements. We disagree.
1. Finell's Testimony
The Thicke Parties object only to three portions of Finell's testimony: her testimony regarding "Theme X," the descending bass line, and the keyboard parts. Finell testified that "Theme X," the descending bass line, and the keyboard rhythms were in the deposit copy.
Finell was cross-examined for four hours. During cross-examination, Finell conceded that the notes of "Theme X" were not written on the sheet music, and she was questioned about her testimony that the notes of "Theme X" were implied in the deposit copy. She also acknowledged that the bass melody she presented at trial differed from that notated in the deposit copy. She was impeached with her deposition testimony, in which she admitted that the rhythm of the keyboard parts in the sound recording of "Got To Give It Up" is not notated in the deposit copy.
Wilbur disputed her testimony, opining that "Theme X," the descending bass line, and the keyboard rhythms are not contained in the deposit copy. The dispute *1126 boiled down to a question of whose testimony to believe. Both experts referenced the sound recording.[12] Both experts agreed that sheet music requires interpretation.[13] The question of whose interpretation of the deposit copy to credit was a question properly left for the jury to resolve. See Three Boys Music , 212 F.3d at 485-86 ("We refuse to interfere with the jury's credibility determination[.]"). Therefore, the district court did not abuse its discretion by permitting Finell's testimony.
2. Dr. Monson's Testimony
The Thicke Parties argue that the district court abused its discretion in allowing Dr. Monson to play audio "mash-ups" superimposing Marvin Gaye's vocals from "Got To Give It Up" onto the accompaniment in "Blurred Lines," and vice versa. They argue that the "mash-ups" contained unprotectable elements, such as the keyboard parts, bass melodies, and Marvin Gaye's vocals.[14]
This argument faces the same hurdle as the Thicke Parties' objection to Finell's testimony. Dr. Monson testified that there were structural similarities between the two songs at a sectional level and at a phrasing level, and used the "mash-ups" to demonstrate the songs' shared harmonic and melodic compatibility. We have permitted similar expert testimony in the past. Cf. Swirsky , 376 F.3d at 845-47 (holding that district court erred in discounting expert's testimony regarding structural similarities between two choruses). Dr. Monson was cross-examined on her opinion, and the jury was free to weigh her testimony as it saw fit.
Our decision in Three Boys Music confirms that the district court acted within its discretion. Three Boys Music was a 1909 Act copyright infringement case in which the jury heard not only a rendition of the deposit copy, see 212 F.3d at 486, but the complete commercial sound recording of the copyrighted song. Although the sufficiency of the deposit copy arose in the context of subject matter jurisdiction in Three Boys Music , our treatment of the issue lends support for our present conclusion. In Three Boys Music , the defendants argued that there were "inaccuracies in the deposit copy." 212 F.3d at 486-87. While the plaintiffs' expert testified that "the song's essential elements" were in the deposit copy, the defendants argued that "the majority of the musical elements that were part of the infringement claim" were not in the deposit copy. Id. at 486. Despite the fact that the jury heard the complete sound recording, which differed from the deposit copy, we still upheld the jury's verdict finding for the plaintiffs.[15] Id. at 486-87.
*1127 Here, the district court excluded the commercial sound recording of "Got To Give It Up" from trial, and vigilantly policed the admission of testimony throughout trial, repeatedly instructing counsel to ensure that the experts tethered their testimony to the sheet music. The district court did not abuse its discretion in admitting portions of the Gayes' experts' testimony.
C. The Verdict Was Not Against the Clear Weight of the Evidence.
The Thicke Parties argue that the verdict is against the clear weight of the evidence, maintaining that there is no extrinsic or intrinsic similarity between the two songs.
We are bound by the " 'limited nature of our appellate function' in reviewing the district court's denial of a motion for a new trial." Lam , 869 F.3d at 1084 (quoting Kode , 596 F.3d at 612 ). So long as "there was some 'reasonable basis' for the jury's verdict," we will not reverse the district court's denial of a motion for a new trial. Id. (quoting Molski , 481 F.3d at 729 ). "[W]here the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable." Id. (quoting Kode , 596 F.3d at 612 ). When that is the case, we reverse "only when there is an absolute absence of evidence to support the jury's verdict." Id. (quoting Kode , 596 F.3d at 612 ). "It is not the courts' place to substitute our evaluations for those of the jurors." Union Oil Co. of Cal. v. Terrible Herbst, Inc. , 331 F.3d 735, 743 (9th Cir. 2003). Of note, we are "reluctant to reverse jury verdicts in music cases" on appeal, "[g]iven the difficulty of proving access and substantial similarity."[16] Three Boys Music , 212 F.3d at 481.
The Thicke Parties face significant, if not unsurmountable, hurdles. First, we are generally reluctant to disturb the trier of fact's findings, and have made clear that "[w]e will not second-guess the jury's application of the intrinsic test." Id. at 485. Second, our review is necessarily deferential where, as here, the district court, in denying the Rule 59 motion, concluded that the verdict was not against the clear weight of the evidence. Finell testified that nearly every bar of "Blurred Lines" contains an area of similarity to "Got To Give It Up." Even setting aside the three elements that trouble the Thicke Parties ("Theme X," the bass line, and the keyboard parts), Finell and Dr. Monson testified to multiple other areas of extrinsic similarity, including the songs' signature phrases, hooks, bass melodies, word painting, the placement of the rap and "parlando" sections, and structural similarities on a sectional and phrasing level. Thus, we cannot say that there was an absolute absence of evidence supporting the jury's verdict.
*1128 We conclude that the district court did not abuse its discretion in denying the Thicke Parties' motion for a new trial.
IV. The Awards of Actual Damages and Profits and the District Court's Running Royalty Were Proper.
A. The Award of Damages Was Not Based on Undue Speculation.
We afford "great deference" to a jury's award of damages and will uphold the award "unless it is 'clearly not supported by the evidence' or 'only based on speculation or guesswork.' " In re First All. Mortg. Co. , 471 F.3d 977, 1001 (9th Cir. 2006) (quoting L.A. Mem'l Coliseum Comm'n v. Nat'l Football League , 791 F.2d 1356, 1360 (9th Cir. 1986) ). We will uphold an award of hypothetical-license damages "provided the amount is not based on 'undue speculation.' " Oracle Corp. v. SAP AG , 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting Polar Bear Prods., Inc. v. Timex Corp. , 384 F.3d 700, 709 (9th Cir. 2004) ). "The touchstone for hypothetical-license damages is 'the range of [the license's] reasonable market value.' " Id. (alteration in original) (quoting Polar Bear Prods., Inc. , 384 F.3d at 709 ) ).
Here, the jury awarded the Gayes actual damages in the amount of 50% of the publishing revenues for "Blurred Lines." The Thicke Parties ask us to vacate the award of $3,188,527.50 (remitted by the district court from the jury's original award of $4 million),[17] because it was based upon an unduly speculative hypothetical license rate of 50%. We disagree.
The Gayes called Nancie Stern, an industry expert with over twenty years of experience in negotiating and assigning valuations for the use of portions of older musical compositions in new compositions. Stern has performed such valuations thousands of times. Major labels, as well as renowned artists, have retained her services. Few other people or businesses perform her line of work.
Stern testified that the prototypical negotiation centers on the percentage of the new musical composition that the owner of the older composition should receive for the use. The industry standard assigns 50% for the music and 50% for the lyrics. Turning to the two songs at hand, Stern opined that the value of the use of "Got To Give It Up" in "Blurred Lines" would have been 50% had the Thicke Parties sought a license pre-release. Had the Thicke Parties sought a license post-release, the valuation would range between 75% to 100% percent. Stern arrived at her conclusion by reviewing "snippets" of the two songs and "A-B'ing" them, or playing them back and forth.[18] Stern's methodology and opinion were not unduly speculative, but tethered to her deep industry expertise.
In an attempt to buttress their position, the Thicke Parties cite to two decisions which are distinguishable. In Oracle , we held the jury's award of $1.3 billion in hypothetical-license damages to be unduly speculative because "the evidence presented at trial failed to provide 'the range of the reasonable market value' " underlying the actual damages award. 765 F.3d at 1089 (quoting *1129 Polar Bear Prods., Inc. , 384 F.3d at 709 ). Oracle's evidence was based on projected benefits and costs, and Oracle lacked a history of granting comparable licenses and provided no evidence of "benchmark" licenses in the industry. See id. at 1091-93. "Although a copyright plaintiff need not demonstrate that it would have reached a licensing agreement with the infringer or present evidence of 'benchmark' agreements in order to recover hypothetical-license damages," we observed that "it may be difficult for a plaintiff to establish the amount of such damages without undue speculation in the absence of such evidence." Id. at 1093.
Here, as in Oracle , there is no evidence of a prior benchmark license agreement between the Thicke Parties and the Gayes. However, in contrast to Oracle , the Gayes tethered their hypothetical license damages to evidence of a benchmark license in the industry. Instead of relying on undue speculation, the Gayes presented an expert who had extensive and specialized knowledge regarding the type of hypothetical license at issue. Stern opined, based on an industry standard and her evaluation of the songs involved, that the reasonable market value of a license would range between 50% pre-release and 75% to 100% post-release.
In Uniloc USA, Inc. v. Microsoft Corp. , 632 F.3d 1292 (Fed. Cir. 2011), the Federal Circuit held that the "25 percent rule of thumb," used in patent cases "to approximate the reasonable royalty rate that the manufacturer of a patented product would be willing to offer to pay to the patentee during a hypothetical negotiation," is a "fundamentally flawed tool." 632 F.3d at 1312, 1315. The Federal Circuit observed that the 25% rule is "an abstract and largely theoretical construct" that "does not say anything about a particular hypothetical negotiation or reasonable royalty involving any particular technology, industry, or party." Id. at 1317. The 50% standard Stern identified does not extend without bounds across art forms or different copyrightable media in the same way the 25% rule of thumb applied without regard to the industry or technology involved. Stern's opinion was not based on abstraction, but on an industry standard and her expert assessment of the two songs. Her testimony was not unduly speculative, and did not render the damages award improper.
B. The Award of Profits Is Not Clearly Erroneous.
We review an apportionment of infringer's profits for clear error. Cream Records, Inc. v. Joseph Schlitz Brewing Co. , 864 F.2d 668, 669 (9th Cir. 1989) (per curiam); see also Three Boys Music , 212 F.3d at 487 (upholding jury's apportionment of profits for lack of clear error). The burden is on the defendant to prove what percentage of its profits is not attributable to infringement. Three Boys Music , 212 F.3d at 487.
The Thicke Parties contend that the award of $1,768,191.88 in profits against Thicke and $357,630.96 (remitted by the district court from the jury's original award of $1,610,455.31) against Williams, which amounted to approximately 40% of their non-publishing profits from "Blurred Lines," is excessive. They assert that the evidence supports a profits award of only 5%, citing Wilbur's opinion that less than 5% of "Blurred Lines" contains elements allegedly similar to ones in "Got To Give It Up."
We affirmed a similar profits award in Three Boys Music . See id. In Three Boys Music , the defendant presented evidence that only 10% to 15% of profits were attributable to the song's infringing elements. Id. Despite the evidence, the jury attributed 66% of profits to the song's infringing elements. Id. Here, the Thicke *1130 Parties bore the burden of proof. The jury was free to accept Wilbur's testimony or instead credit Finell's testimony that nearly every measure of "Blurred Lines" contains an element similar to "Got To Give It Up." The jury's choice to "apportion[ ] less than 100% of the profits but more than the percentage estimates of [the Thicke Parties'] expert[ ] does not represent clear error." Id.
C. The District Court Did Not Abuse its Discretion in Awarding the Gayes a Running Royalty at the Rate of 50%.
We review a district court's decision to award equitable relief for abuse of discretion. Traxler v. Multnomah County , 596 F.3d 1007, 1014 n.4 (9th Cir. 2010) ; see also Presidio Components, Inc. v. Am. Tech. Ceramics Corp. , 702 F.3d 1351, 1363 (Fed. Cir. 2012) (reviewing district court's imposition of an ongoing royalty for abuse of discretion). Findings of fact are reviewed for clear error. See Traxler , 596 F.3d at 1014 n.4.
The district court based the royalty rate on Stern's testimony. For the same reasons set forth above, see supra Part VI.A, we conclude that the district court did not abuse its discretion in awarding the Gayes a running royalty at the rate of 50%.
V. The District Court Erred in Overturning the Jury's General Verdict in Favor of Harris and the Interscope Parties.
We review de novo a district court's grant of judgment as a matter of law. Wallace v. City of San Diego , 479 F.3d 616, 624 (9th Cir. 2007). We also review de novo a trial judge's decision to disrupt a jury verdict on the basis that an erroneous instruction resulted in inconsistent verdicts. Westinghouse Elec. Corp. v. Gen. Circuit Breaker & Elec. Supply Inc. , 106 F.3d 894, 901 (9th Cir. 1997).
Harris and the Interscope Parties contend that the district court erred in overturning the jury's general verdicts finding in their favor. We agree. First, the Gayes waived any challenge to the consistency of the jury's general verdicts. Second, even had the Gayes preserved their challenge, neither Federal Rule of Civil Procedure 50(b) nor our decisions in Westinghouse , 106 F.3d 894, and El-Hakem v. BJY Inc. , 415 F.3d 1068 (9th Cir. 2005), conferred authority on the district court to upset the jury's verdicts in this case. Third, as to Harris specifically, the district court erred for the additional reason that no evidence showed Harris was vicariously liable.
A. The Gayes Waived Any Challenge to the Consistency of the Jury's General Verdicts.
A party "waive[s] its objection to the jury's verdict ... by not objecting to the alleged inconsistency prior to the dismissal of the jury." Home Indem. Co. v. Lane Powell Moss & Miller , 43 F.3d 1322, 1331 (9th Cir. 1995) ; see also Kode , 596 F.3d at 611 (recognizing waiver where "the moving party argues that the jury has rendered a verdict that contains two legal conclusions that are inconsistent with one another, and the moving party does not object before jury discharge"); Philippine Nat'l Oil Co. v. Garrett Corp. , 724 F.2d 803, 806 (9th Cir. 1984) (holding that a party "waived its right to object to the verdict by failing to object when the verdict was read"). The Gayes did not object to the jury's verdicts prior to jury discharge. Nor did they object during a colloquy with the district court after the jury was discharged. They thus waived their challenge to any perceived inconsistencies between the jury's general verdicts.[19]
*1131 B. The Gayes' Failure to Make a Motion Under Federal Rule of Civil Procedure 50(a) Precluded Relief Under Rule 50(b).
"Under Rule 50, a party must make a Rule 50(a) motion for judgment as a matter of law before a case is submitted to the jury." EEOC v. Go Daddy Software, Inc. , 581 F.3d 951, 961 (9th Cir. 2009). The Gayes did not make a Rule 50(a) motion. Because "failure to file a Rule 50(a) motion precludes consideration of a Rule 50(b) motion for judgment as a matter of law," Tortu v. Las Vegas Metro. Police Dep't , 556 F.3d 1075, 1083 (9th Cir. 2009), Rule 50(b) did not authorize the district court to overturn the jury's general verdicts and adjudge Harris and the Interscope Parties liable as a matter of law.[20]
C. Westinghouse and El-Hakem Do Not Apply.
The district court relied on two of our decisions to overturn the jury's general verdicts: Westinghouse , 106 F.3d 894, and El-Hakem , 415 F.3d 1068. Neither decision applies in this case.
In Westinghouse , we affirmed a district court's decision to reconcile inconsistent general verdicts resulting from an erroneous jury instruction. See 106 F.3d at 902. There, the culprit was an erroneous instruction which added an extra element to an affirmative defense. Id. at 898. We held that where "it is possible to examine the pattern of jury verdicts and logically determine what facts a rational juror must have found in order to reach those verdicts," and the error is traceable to an erroneous jury instruction, the district court may "apply the correct law to these implicit factual findings and thereby ... remedy the harm from the erroneous jury instruction without the expense and delay of a new trial." Id. at 902.
However, Westinghouse involved a "seemingly rare situation." Id. The Westinghouse exception to letting inconsistent general verdicts stand applies sparingly. "[I]n most cases where a jury renders inconsistent verdicts, the trial judge must allow those verdicts to stand because 'it is unclear whose ox has been gored.' " Id. at 903 (quoting United States v. Powell , 469 U.S. 57, 65, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) ). District courts may "reconcile the verdicts without intruding upon the jury's fact-finding role" only under "very limited circumstances," where "there is an identifiable error that only could have affected one of the verdicts," "where the necessary factual findings can be determined from the pattern of verdicts," and where there is "nothing to [be] gain[ed] from a new trial." Id. at 902.
Those rare circumstances are not present in this case. The district court concluded that its instructions on distribution liability were inadequate, and that with clearer instructions, the jury would necessarily have found the Interscope Parties and Harris liable for distributing the infringing work. However, the instructions did not contain any error on par with the unmistakably erroneous instruction in Westinghouse .
Next, El-Hakem does not authorize the reconciliation of inconsistent general verdicts. It is clear that our holding in *1132 El-Hakem stemmed from law specific to special verdicts.[21] Indeed, we observed that "[w]hen confronted by seemingly inconsistent responses to special verdict interrogatories, a trial court has a duty to harmonize those responses whenever possible." El-Hakem , 415 F.3d at 1074 (emphasis added). In contrast, there is no duty to reconcile inconsistent general verdicts. We have held, in accordance with the majority rule, that "legally inconsistent verdicts 'may nonetheless stand on appeal even though inconsistent.' " Zhang v. Am. Gem Seafoods, Inc. , 339 F.3d 1020, 1035 (9th Cir. 2003) (quoting Int'l Longshoremen's & Warehousemen's Union (CIO) v. Hawaiian Pineapple Co. , 226 F.2d 875, 881 (9th Cir. 1955) ). We see no reason to deviate from this rule today.
D. Harris Is Not Vicariously Liable.
The district court erred in entering judgment against Harris for the additional reason that the Gayes proffered no evidence establishing that Harris was secondarily liable for vicarious infringement. The Gayes argue, without citing to the record or to any law, that Harris is liable as a matter of law as a co-owner of the copyright who authorized the distribution of "Blurred Lines."[22] They are incorrect both legally and factually.
To be vicariously liable for copyright infringement, one must have "(1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." Perfect 10, Inc. v. Visa Int'l Serv., Ass'n , 494 F.3d 788, 802 (9th Cir. 2007). A vicarious infringer "exercises control over a direct infringer when he has both a legal right to stop or limit the directly infringing conduct, as well as the practical ability to do so." Perfect 10, Inc. v. Amazon.com, Inc. , 508 F.3d 1146, 1173 (9th Cir. 2007).
No evidence was adduced at trial supporting a theory of vicarious liability. Harris, who did not testify at trial, independently wrote and recorded a rap verse that was added to the track seven months after Thicke and Williams created "Blurred Lines." Neither Thicke nor Williams expected the later addition of a rap verse or had anything to do with its creation. The Gayes have cited nothing in the record demonstrating that Harris had either a right to stop the infringing conduct or the ability to do so, much less both.
We conclude that the district court erred in upsetting the jury's general verdicts in favor of Harris and the Interscope Parties and entering judgment against them.
VI. The District Court Did Not Abuse its Discretion in Denying the Gayes' Motion for Attorney's Fees.
We review a district court's decision on attorney's fees for abuse of discretion. Stetson v. Grissom , 821 F.3d 1157, 1163 (9th Cir. 2016).
The Gayes request that we vacate the district court's order denying their motion for attorney's fees and remand the case for reconsideration in light of Kirtsaeng v. John Wiley & Sons, Inc. , --- U.S. ----, 136 S.Ct. 1979, 195 L.Ed.2d 368 (2016). In Kirtsaeng , the Supreme Court reaffirmed the principle that, in exercising *1133 its authority under § 505 of the Copyright Act to award a prevailing party attorney's fees, a court "should give substantial weight to the objective reasonableness of the losing party's position." Id. at 1983. The Court cautioned, however, that "the court must also give due consideration to all other circumstances relevant to granting fees; and it retains discretion, in light of those factors, to make an award even when the losing party advanced a reasonable claim or defense." Id.
Here, the district court's examination of objective reasonableness was but one factor in its analysis. The district court took the specific circumstances of the case into consideration, including the degree of success obtained, the purposes of the Copyright Act, the chilling effect of attorney's fees, motivation, frivolousness, factual and legal unreasonableness, compensation, and deterrence. The district court did not abuse its discretion in denying the Gayes' motion for attorney's fees, and a remand on that issue is not warranted.
VII. The District Court Did Not Abuse its Discretion in Apportioning Costs Among the Parties.
We review the district court's award of costs for abuse of discretion. Draper v. Rosario , 836 F.3d 1072, 1087 (9th Cir. 2016).
Federal Rule of Civil Procedure 54(d)(1) authorizes the award of costs "to the prevailing party." A "party in whose favor judgment is rendered is generally the prevailing party for purposes of awarding costs under Rule 54(d)." San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys. , 568 F.3d 725, 741 (9th Cir. 2009) (quoting d'Hedouville v. Pioneer Hotel Co. , 552 F.2d 886, 896 (9th Cir. 1977) ). Here, the district court entered judgment for the Gayes on their claim that "Blurred Lines" infringed their copyright in "Got To Give It Up," but entered judgment for the Thicke Parties on the Gayes' claim that "Love After War" infringed their copyright in "After the Dance." The district court apportioned the award of costs accordingly, awarding the Gayes their costs for the "Blurred Lines" claim, and awarding the Thicke Parties their costs for the "Love After War" claim.
The Gayes urge us to adopt the Federal Circuit's holding that "there can only be one prevailing party in a given case" for purposes of Rule 54(d)(1). Shum v. Intel Corp. , 629 F.3d 1360, 1367 (Fed. Cir. 2010). Despite the Federal Circuit's singular construction of "the prevailing party," it affirmed an award of costs functionally equivalent to the one the district court ordered in this case. See id. at 1364. The Federal Circuit held that "the district court did not abuse its discretion in awarding costs to each party with respect to the claims on which they each prevailed, then netting those sums to arrive at the final figure." Id. Here, as in Shum , the district court in effect reduced the Gayes' costs award "to reflect the extent of [their] victory." Id. at 1370. This was not an abuse of discretion.[23]
*1134 VIII. You Can't Get There from Here: The Dissent Ignores Governing Law that We Must Apply Given the Procedural Posture of the Case.
The dissent's position violates every controlling procedural rule involved in this case. The dissent improperly tries, after a full jury trial has concluded, to act as judge, jury, and executioner, but there is no there there, and the attempt fails.
Two barriers block entry of judgment as a matter of law for the Thicke Parties. The dissent attempts to sidestep these obstacles: It finds that the Thicke Parties are entitled to judgment as a matter of law, but fails to explain the procedural mechanism by which this could be achieved. Given this flawed premise, it is perhaps unsurprising how little the dissent mirrors the majority opinion, and how far it veers into analysis untethered from the procedural posture of this case.
First, the dissent incorrectly concludes that there are no procedural obstacles barring entry of judgment as a matter of law for the Thicke Parties. The dissent is unable to distinguish the Supreme Court's decision in Ortiz , which prevents us from reviewing the district court's order denying summary judgment after a full trial on the merits. 562 U.S. at 183-84, 131 S.Ct. 884. Even assuming our court's limited exception for reviewing a denial of summary judgment for legal error, see Escriba , 743 F.3d at 1243, survives Ortiz without change, we reiterate, without recapitulating our earlier analysis, supra Part II, that the dissent's attempt to distinguish Ortiz and latch onto the exception outlined in Escriba is futile in this case. This case "hardly present[s] 'purely legal' issues capable of resolution 'with reference only to undisputed facts.' " Ortiz , 562 U.S. at 189, 131 S.Ct. 884. Even though the dissent's musicological exegesis has no bearing on our analysis at this procedural stage of the case, it clearly shows that the facts in this case are hotly disputed and that the case does not just involve pure issues of law. The dissent cites no controlling law authorizing it to undertake its own summary judgment analysis at this stage of the case.
Second, the Thicke Parties, like the Gayes, failed to make a Rule 50(a) motion for judgment as a matter of law at trial. Their failure to do so "precludes consideration of a Rule 50(b) motion for judgment as a matter of law." Tortu , 556 F.3d at 1083.[24] Just as the district court could not enter judgment as a matter of law for the Thicke Parties, we cannot do so either.
This procedural limitation is well worth underscoring. We held, in a case in which a party made an oral Rule 50(a) motion, but failed to renew its motion, that the party "waived its challenge to the sufficiency of the evidence because it did not renew its pre-verdict Rule 50(a) motion by filing a post-verdict Rule 50(b) motion." Nitco Holding Corp. v. Boujikian , 491 F.3d 1086, 1089 (9th Cir. 2007). We further held that, under the Supreme Court's decision in Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc. , 546 U.S. 394, 126 S.Ct. 980, 163 L.Ed.2d 974 (2006), the party's failure to renew a Rule 50(a) motion "precluded *1135 [us] from exercising our discretion to engage in plain error review." Nitco , 491 F.3d at 1089-90. We thus overruled our "prior decisions permit[ing] a discretionary plain error review" in the absence of a Rule 50(a) motion "as in conflict with controlling Supreme Court authority." Id. (citing Miller v. Gammie , 335 F.3d 889, 900 (9th Cir. 2003) (en banc) ). Thus, when we stitch together Rule 50's requirements with our case law, we are left with this result: Because "a post-verdict motion under Rule 50(b) is an absolute prerequisite to any appeal based on insufficiency of the evidence," id. at 1089, and because a Rule 50(a) motion is, in turn, a prerequisite for a Rule 50(b) motion, see Tortu , 556 F.3d at 1081-83, an advocate's failure to comply with Rule 50's requirements gives us serious pause, and compels us to heighten the level of deference we apply on appeal.
The dissent cites Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), for the proposition that "reviewing a summary judgment ruling and a jury verdict" are two sides of the same coin. The dissent makes an important omission, however. The Supreme Court observed that the standard of review for a directed verdict motion resembles that for a motion for summary judgment:
[T]he "genuine issue" summary judgment standard is "very close" to the "reasonable jury" directed verdict standard: "The primary difference between the two motions is procedural; summary judgment motions are usually made before trial and decided on documentary evidence, while directed verdict motions are made at trial and decided on the evidence that has been admitted."
Id. (quoting Bill Johnson's Rests., Inc. v. NLRB , 461 U.S. 731, 745 n.11, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) ). As neither of the parties made a motion for a directed verdict, we lack a procedural mechanism for resurrecting a summary judgment-stage analysis. As we have emphasized repeatedly, our review on appeal is necessarily circumscribed.
The dissent cites a number of cases it claims support the proposition that a court must award judgment as a matter of law when it is able to determine substantial similarity, or lack thereof, under the extrinsic test. None of the cases the dissent cites, however, authorizes us to review a factbound summary judgment denial after a full trial on the merits, or to enter judgment as a matter of law in the absence of a Rule 50(a) motion below. All of the cases cited in the dissent arise from a different procedural posture, and are clearly distinguishable. See Rentmeester v. Nike, Inc. , 883 F.3d 1111, 1116 (9th Cir. 2018) (reviewing grant of motion to dismiss); Folkens v. Wyland Worldwide, LLC , 882 F.3d 768, 773 (9th Cir. 2018) (reviewing grant of summary judgment); Antonick v. Elec. Arts, Inc. , 841 F.3d 1062, 1065 (9th Cir. 2016) (reviewing grant of judgment as a matter of law); Peters v. West , 692 F.3d 629, 632 (7th Cir. 2012) (reviewing grant of motion to dismiss); Mattel , 616 F.3d at 912-13, 918 (vacating equitable relief awarded by district court on other grounds, where the district court had "made its own infringement findings in determining whether Mattel was entitled to equitable relief" (emphasis added) ); Benay , 607 F.3d at 622 (reviewing grant of summary judgment); Newton v. Diamond , 388 F.3d 1189, 1190 (9th Cir. 2004) (reviewing grant of summary judgment); Calhoun v. Lillenas Publ'g , 298 F.3d 1228, 1232 (11th Cir. 2002) (per curiam) (reviewing grant of summary judgment). Moreover, to the extent the citations to unpublished dispositions in the dissent carry any weight, which we question, they, too, provide no support for what the dissent seeks to accomplish. See *1136 Briggs v. Sony Pictures Entm't, Inc. , 714 F. App'x 712, 713 (9th Cir. 2018) (reviewing grant of summary judgment); Silas v. Home Box Office, Inc. , 713 F. App'x 626, 627 (9th Cir. 2018) (reviewing grant of motion to dismiss); Mintz v. Subaru of Am., Inc. , 716 F. App'x 618, 620 (9th Cir. 2017) (reviewing grant of motion to dismiss); Edwards v. Cinelou Films , 696 F. App'x 270, 270 (9th Cir. 2017) (reviewing grant of motion to dismiss); Heusey v. Emmerich , 692 F. App'x 928, 928-29 (9th Cir. 2017) (reviewing grant of motion to dismiss); Braddock v. Jolie , 691 F. App'x 318, 319 (9th Cir. 2017) (reviewing grant of motion for judgment on the pleadings); Basile v. Twentieth Century Fox Film Corp. , 678 F. App'x 576, 576 (9th Cir. 2017) (reviewing grant of motion to dismiss).
The dissent's remaining alternative to entering judgment as a matter of law for the Thicke Parties is to vacate the judgment and remand for a new trial. Although the dissent does not state so expressly, it appears that the dissent would reverse the district court's denial of the Thicke Parties' motion for a new trial on grounds that the verdict is against the clear weight of the evidence.
Assuming, arguendo , that is the route the dissent wishes to pursue, it nevertheless runs into several hurdles. Critically, there is no reference to the deferential standard of review applicable to the district court's denial of the Thicke Parties' motion for a new trial. Indeed, there is no discussion of the district court's denial of the motion for a new trial at all. It bears repeating, then, that we are bound by the " 'limited nature of our appellate function' in reviewing the district court's denial of a motion for a new trial." Lam , 869 F.3d at 1084 (quoting Kode , 596 F.3d at 612 ). As is the case here, "where the basis of a Rule 59 ruling is that the verdict is not against the weight of the evidence, the district court's denial of a Rule 59 motion is virtually unassailable." Id. (quoting Kode , 596 F.3d at 612 ). Under these circumstances, "only ... an absolute absence of evidence to support the jury's verdict" will result in reversal. Id. (quoting Kode , 596 F.3d at 612 ). "Although the trial judge can weigh the evidence and assess the credibility of witnesses, we may not." Kode , 596 F.3d at 612 ; see also Landes Constr. Co. v. Royal Bank of Can. , 833 F.2d 1365, 1372 (9th Cir. 1987) ("[W]e cannot weigh the evidence for ourselves....").
In a thorough order, the district court reviewed the evidence presented at trial, and concluded that the verdict was not against the clear weight of the evidence. In faulting us for "tellingly refus[ing] to explain" the evidence supporting the verdict, the dissent ignores the weighty restrictions on our review at this procedural stage of the case. The dissent jettisons the constraints on our review, instead opting for the radical route of playing both expert and juror. The dissent weighs the experts' credibility, resolves factual conflicts, and sets forth its own findings on the extrinsic test.[25] We decline the dissent's invitation to invade the province of the jury: Applying the proper standard of review, one simply cannot say truthfully that there was an absolute absence of evidence supporting the jury's verdict in this case.
To buttress this point, in Swirsky , we reversed the district court's grant of summary judgment of non-infringement, finding the district court erred, in large part, by conducting an analysis similar to the one the dissent has undertaken here. See 376 F.3d at 846-49. Two of our conclusions *1137 in Swirsky are particularly relevant here. First, we held that the district court erred in discounting the expert's musical methodology on technical grounds. See id. at 846-47. For example, the district court rejected the expert's "selective" choice to "discount[ ] notes that he characterize[d] as 'ornamental,' " and discredited the expert's opinion that, "even though measure three of both choruses were not identical in numerical pitch sequence or note selection," they emphasized the same scale degree and resolved similarly. Id. We observed that "[t]here is nothing inherently unsound about [the expert's] musicological methodology," id. at 846, and we similarly decline to conclude otherwise in this case.
Second, we held in Swirsky that the district court "erred by basing its comparison of the two choruses almost entirely on a measure-by-measure comparison of melodic note sequences from the full transcriptions of the choruses." Id. at 847. In so holding, we reiterated our case law. We stressed that "substantial similarity can be found in a combination of elements, even if those elements are individually unprotected." Id. at 848 ; see also Three Boys Music , 212 F.3d at 485 ("It is well settled that a jury may find a combination of unprotectible elements to be protectible under the extrinsic test because ' "the over-all impact and effect indicate substantial appropriation." ' " (quoting Krofft , 562 F.2d at 1169 ) ). In fact, "[e]ven if a copied portion be relatively small in proportion to the entire work, if qualitatively important, the finder of fact may properly find substantial similarity." Swirsky , 376 F.3d at 852 (alteration in original) (quoting Baxter v. MCA, Inc. , 812 F.2d 421, 425 (9th Cir. 1987) ). Thus, even "an arrangement of a limited number of notes can garner copyright protection." Id. at 851. If taken to its logical conclusion, the dissent's musicological analysis and approach would sound the death knell for these governing legal principles.
Consider the principle that, at summary judgment, so long as the Gayes "presented 'indicia of a sufficient disagreement concerning the substantial similarity of [the] two works,' then the case must be submitted to a trier of fact." Id. at 844 (alteration in original) (emphasis added) (quoting Brown Bag Software v. Symantec Corp. , 960 F.2d 1465, 1472 (9th Cir. 1992) ). To require that a case be submitted to a trier of fact if there is any "indicia" of a disagreement regarding substantial similarity, only to impose on the district court the task of independently scrutinizing the expert testimony presented at trial, would turn our law on its head. Worse still, to require a district court to do so in the absence of a Rule 50 motion defies law and logic.
Moreover, the expert review conducted by the dissent does not provide a workable standard for district courts to follow. It is unrealistic to expect district courts to possess even a baseline fluency in musicology, much less to conduct an independent musicological analysis at a level as exacting as the one used by the dissent. After all, we require parties to present expert testimony in musical infringement cases for a reason. See id. at 845.
The dissent has failed to take into account another wrinkle that would ensue from vacating the judgment and remanding the case for a new trial. The Gayes have cross-appealed protectively, challenging the district court's interpretation of the 1909 Act, in the event a new trial is ordered. Even though a vacatur and remand would trigger the Gayes' protective cross-appeal, the dissent does not wrestle with the merits of this issue. While the dissent is adamant that the scope of the Gayes' copyright is limited to the four corners of the deposit copy, it provides no statutory interpretation or legal analysis supporting its assertion.
*1138 Lastly, the dissent prophesies that our decision will shake the foundations of copyright law, imperil the music industry, and stifle creativity. It even suggests that the Gayes' victory will come back to haunt them, as the Gayes' musical compositions may now be found to infringe any number of famous songs preceding them. Respectfully, these conjectures are unfounded hyperbole.[26] Our decision does not grant license to copyright a musical style or "groove." Nor does it upset the balance Congress struck between the freedom of artistic expression, on the one hand, and copyright protection of the fruits of that expression, on the other hand. Rather, our decision hinges on settled procedural principles and the limited nature of our appellate review, dictated by the particular posture of this case and controlling copyright law. Far from heralding the end of musical creativity as we know it, our decision, even construed broadly, reads more accurately as a cautionary tale for future trial counsel wishing to maximize their odds of success.
CONCLUSION
We have decided this case on narrow grounds. Our conclusions turn on the procedural posture of the case, which requires us to review the relevant issues under deferential standards of review. For the foregoing reasons, we reverse the district court's entry of judgment against Harris and the Interscope Parties, and affirm the remainder of the district court's judgment, and its order denying attorney's fees and apportioning costs.
The parties shall bear their own costs on appeal.
AFFIRMED IN PART, REVERSED IN PART.

The Gayes asserted a second counterclaim alleging that Thicke's song "Love After War" infringed their copyright in Marvin Gaye's composition "After the Dance." The jury found against the Gayes on the second counterclaim, and judgment was entered against them. On appeal, the second counterclaim is relevant only to the issue of costs.

According to Finell, the term "hook" refers to the most important and memorable melodic material of a piece of popular music.

Finell named a repeated four-note backup vocal in "Got To Give It Up" as "Theme X."

Although the verdict forms are captioned "Special Verdict," they are functionally general verdict forms. See Zhang v. Am. Gem Seafoods, Inc. , 339 F.3d 1020, 1031 (9th Cir. 2003) ("If the jury announces only its ultimate conclusions, it returns an ordinary general verdict[.]").

More Water From Nazareth Publishing, Inc. collects royalties on Williams' behalf.

"Copyright protection subsists ... in original works of authorship," including "musical works" and "any accompanying words," that are "fixed in any tangible medium of expression." 17 U.S.C. § 102(a). Generally speaking, copyright law does not protect ideas, but rather, protects the expression of ideas. See id. § 102(b) ; Rice , 330 F.3d at 1174. For example, elements of an original work of authorship may be unprotectable by reason of the scenes a faire doctrine. See Swirsky , 376 F.3d at 849-50. According to that doctrine, "when certain commonplace expressions are indispensable and naturally associated with the treatment of a given idea, those expressions are treated like ideas and therefore not protected by copyright." Id. at 850.

Even the de minimis exception, which renders insignificant copying inactionable, does not require a standard of similarity as exacting as virtual identity. See VMG Salsoul, LLC v. Ciccone , 824 F.3d 871, 878 (9th Cir. 2016) ("A 'use is de minimis only if the average audience would not recognize the appropriation.' " (quoting Newton v. Diamond , 388 F.3d 1189, 1193 (9th Cir. 2004) ) ).

17 U.S.C. § 102(a)(2) protects "musical works," while § 102(a)(7) protects "sound recordings." " 'Sound recordings' are works that result from the fixation of a series of musical, spoken, or other sounds ..., regardless of the nature of the material objects, such as disks, tapes, or other phonorecords, in which they are embodied." 17 U.S.C. § 101.

To our knowledge, the Thicke Parties' position had not found support in case law until the district court's ruling. See Three Boys Music , 212 F.3d at 486 (observing, in the context of subject matter jurisdiction, that "[a]lthough the 1909 Copyright Act requires the owner to deposit a 'complete copy' of the work with the copyright office, our definition of a 'complete copy' is broad and deferential"); see also 17 U.S.C. § 704 (providing that the Register of Copyrights and the Librarian of Congress may destroy or otherwise dispose of original deposit copies if certain facsimile requirements are met); Marya v. Warner/Chappell Music, Inc. , 131 F.Supp.3d 975, 982 (C.D. Cal. 2015) (observing that "[t]he Copyright Office no longer has the deposit copy" of the work at issue, which was registered in 1935); 2 Nimmer on Copyright § 7.17[A] (2017) (noting that "[t]he function of deposit is to provide the Library of Congress via the Copyright Office with copies and phonorecords of all works published within the United States," and that the argument "that deposit has a copyright as well as an archival function" is "attenuated by the fact that the Library of Congress need not add all deposited works to its collection" or "preserve those works which it does add to its collection").

While Escriba , a 2014 decision, post-dates Ortiz , Escriba does not reference the Supreme Court's decision. See 743 F.3d at 1243.

Instruction 28 provides: "The Gaye Parties may show the Thicke Parties copied from the work by showing by a preponderance of the evidence that the Thicke Parties had access to the Gaye Parties' copyrighted work and that there are substantial similarities between the Thicke Parties' work and original elements of the Gaye Parties' work." That the instruction uses the permissive "may" presents no problem. It simply reflects the fact that the Gayes may, but are not required to, prove copying by way of a circumstantial theory, rather than a direct one.
Instruction 41 provides: "If you conclude that the Thicke Parties had access to either or both of the Gaye Parties' works before creating either or both of their works, you may consider that access in connection with determining whether there is substantial similarity between either or both pairs of works." Instruction 41's use of "may" is not problematic either. Instruction 41 merely reiterates that the Gayes may choose to prove infringement by using a circumstantial theory.

Wilbur initially relied upon the commercial sound recording of "Got To Give It Up" to prepare her transcriptions. She continued to rely upon her transcriptions from the commercial sound recording, finding that they were substantially the same as the transcriptions prepared from the deposit copy.

On cross-examination, Wilbur acknowledged that a lead sheet reflects a simplified version of a chord pattern in a composition, and that chord notation is merely representational.
Wilbur also acknowledged that she relied on her interpretation of what was contained within the lead sheet to create her recording of "Got To Give It Up." She admitted that she made choices to deviate from the sheet music, and that her choices were informed by her musical training and knowledge. For example, despite the sheet music's instruction to continue playing a bass line throughout the song, she chose not to do so in certain parts of the song, knowing that playing the bass line would clash with certain chords.

Although the "mash-ups" used Marvin Gaye's vocals, the parties have not disputed whether Marvin Gaye's vocals were notated in the deposit copy.

It appears that factfinders have listened to commercial sound recordings in other music copyright infringement cases governed by the 1909 Act. See, e.g. , Repp v. Webber , 892 F.Supp. 552, 558 (S.D.N.Y. 1995) ("Having listened to the two songs at issue, however, the Court cannot say as a matter of law that they do not share any substantial similarities."); Bright Tunes Music Corp. v. Harrisongs Music, Ltd. , 420 F.Supp. 177, 180 (S.D.N.Y. 1976) (noting that the similarity between the songs "is perfectly obvious to the listener"), aff'd sub nom. ABKCO Music, Inc. v. Harrisongs Music, Ltd. , 722 F.2d 988 (2d Cir. 1983) ; N. Music Corp. v. King Record Distrib. Co. , 105 F.Supp. 393, 398 (S.D.N.Y. 1952) ("We have suffered through the playing of the commercial recordings.").

Our conclusion in Three Boys Music provides an example of the deference we must apply in reviewing the jury's verdict. Although that case presented "a weak case of access and a circumstantial case of substantial similarity," we held that "neither issue warrants reversal of the jury's verdict." 212 F.3d at 486.

The district court concluded that it had erred in informing the jury that the publishing revenues amounted to $8 million, where the parties had stipulated that the publishing revenues totaled $6,377,055. Having determined that the jury applied a royalty rate of 50% to the publishing revenues, the district court remitted the damages award from $4 million to $3,188,527.50, which is 50% of $6,377,055.

Although the Thicke Parties contend that Stern impermissibly based her testimony on the sound recording of "Got To Give It Up," Stern testified that her opinion was based solely on the edited clips approved for trial.

The Gayes have not addressed the issue of waiver on appeal.

There is one safety valve for what is otherwise a "harsh" rule: "Rule 50(b)'may be satisfied by an ambiguous or inartfully made motion' under Rule 50(a).' " Go Daddy Software, Inc. , 581 F.3d at 961 (quoting Reeves v. Teuscher , 881 F.2d 1495, 1498 (9th Cir. 1989) ). The Gayes briefly argue that a colloquy between their counsel and the district court regarding jury instructions and verdict forms qualifies as an "ambiguous or inartfully made" Rule 50(a) motion. The colloquy falls far short of the standard for a Rule 50(a) exception based on an "ambiguous or inartfully made" motion.

It is true, as the Gayes observe, that while we classified the verdicts in El-Hakem as special verdicts, they were functionally general verdicts. See El-Hakem v. BJY Inc ., 262 F.Supp.2d 1139, 1146 (D. Or. 2003), aff'd , 415 F.3d 1068 (9th Cir. 2005). Notwithstanding this fact, El-Hakem is distinguishable for the reasons above, and for the additional reason that the parties in El-Hakem , unlike the parties in this case, moved for judgment as a matter of law. 415 F.3d at 1072.

The parties' stipulation that Harris co-owned 13% of the musical composition copyright in "Blurred Lines" sheds no light on Harris's role in the distribution process.

Additional authorities support our conclusion. See In re Paoli R.R. Yard PCB Litig. , 221 F.3d 449, 469 (3d Cir. 2000) ("The general rule in this circuit and others is that a district court, in exercising its equitable discretion, may apportion costs between the prevailing and non-prevailing parties as it sees fit."); Amarel v. Connell , 102 F.3d 1494, 1524 (9th Cir. 1997) (instructing the district court to "await the outcome of the [Sherman Act] Section 1 claim to ascertain whether allocation of costs is necessary," rather than "attempting to award partial costs at this juncture," where defendants prevailed on the Section 2 claim, but we remanded the Section 1 claim for a new trial).

Even in a case where the defendant argued that the district court "induced him not to file [a] Rule 50(a) motion," we nonetheless adhered to the strict requirements of Rule 50, noting that the defendant still "could have filed a Rule 50(a) motion ... before the matter had been submitted to the jury," and holding that the defendant's "disregard[ ]" of Rule 50's "clear requirements" foreclosed the possibility of relief pursuant to Rule 50(b). Tortu , 556 F.3d at 1083. Here, the Thicke Parties could-and should-have filed a Rule 50(a) motion in order to preserve their ability to make a Rule 50(b) motion, regardless of whether or not the district court would have granted the motion.

The dissent does not mention the fact that the jury also considered the intrinsic test in reaching its verdict. The dissent correctly stops short of explicitly "second-guess[ing] the jury's application of the intrinsic test," Three Boys Music , 212 F.3d at 485, which is reserved exclusively for the trier of fact, Benay , 607 F.3d at 624.

Unlike the 1909 Act, the current copyright regime, established by the 1976 Act, protects "works of authorship" fixed in "sound recordings." 17 U.S.C. § 102. Despite the dissent's prediction that our decision will "strike[ ] a devastating blow to future musicians and composers everywhere," the reality is that, going forward, a number of the contentious issues presented in this case will occur with less frequency with the passage of time.